UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| *In re* Iraq and Afghanistan Detainees Litigation | ) ) ) |
| | ) |
| ARKAN MOHAMMED ALI, *et al.*, | ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| RICARDO S. SANCHEZ, | ) ) |
| Defendant. | ) ) ) |

Case No. 05-1380-TFH

**LIEUTENANT GENERAL RICARDO SANCHEZ'S
MOTION TO DISMISS AMENDED COMPLAINT**

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and for the

reasons stated fully in the Memorandum of Points and Authorities In Support of Lieutenant

General Ricardo Sanchez's Motion to Dismiss Amended Complaint, Lieutenant General Ricardo

Sanchez respectfully moves for the dismissal of all causes of action alleged against him in the

Consolidated Amended Complaint for Declaratory Relief and Damages (the "Amended

Complaint"). All of the claims alleged in the Amended Complaint must be dismissed pursuant to

Fed. R. Civ. P. 12(b)(1) because they present non-justiciable questions delegated by the

constitution to the political branches. The constitutional tort claims asserted against General

Sanchez in the first and second causes of action of the Amended Complaint must be dismissed

for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). The violations of international

law alleged in the third, fourth, and fifth causes of action must also be dismissed pursuant to Fed.

R. Civ. P. 12(b)(6) for failure to state a claim against General Sanchez. Finally, to the extent that

plaintiffs allege a claim for declaratory relief against General Sanchez, that claim must be

dismissed for lack of standing.  A proposed order of dismissal is attached hereto.

Respectfully submitted,

                                    /s/ Ryan E. Bull_____
STEPHEN L. BRAGA
(D.C. Bar No. 366727)
RYAN E. BULL
(D.C. Bar No. 481743)
JOSHUA KLEIN
BAKER BOTTS LLP
1299 Pennsylvania Ave., NW
Washington, D.C. 20004
(202) 639-7700

March 6, 2006                              *Counsel for Lieutenant General Ricardo S. Sanchez*

CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of March 2006, I sent one copy of Lieutenant General

Ricardo Sanchez's Motion to Dismiss Amended Complaint and the corresponding Memorandum

of Points and Authorities to the following counsel via First Class, United States Mail:

Bill Lann Lee
Chimene K. Keitner
Nirej S. Sekhon
Leiff, Cabraser, Heimann & Bernstein LLP
275 Battery Street, Suite 3000
San Francisco, CA 94111-3339

Lucas Guttentag
Cecillia Wang
American Civil Liberties Union Foundation
Immigrants' Rights Project
405 14th Street, Suite 300
Oakland, CA 94612

Paul Hoffman
Schonbrun  DeSimone  Seplow  Harris  &
Hoffman LLP
723 Ocean Front Walk
Venice, CA  90291

Steven R. Shapiro
Omar C. Jadwat
Amrit Singh
Steven Watt
American Civil Liberties Union Foundation
125 Broad Street
New York, NY  10044

Erwin Chemerinsky
Duke University School of Law
Science Drive & Towerview Rd.
Durham, NC  27707

David Rudovsky
Kairys, Roduovsky, Epstein & Messing LLP
924 Cherry St., Suite 500
Philadelphia, PA 19107

Marcus Meeks
US Department of Justice
Torts Branch, Civil Division
P.O. Box 7146 Ben Franklin Station
Washington, D.C. 20044

Michael L. Martinez
Paul D. Flynn
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595

Mark E. Nagle
Troutman Sanders LLP
401 Ninth Street, N.W., Suite 1000
Washington, D.C. 20004

All counsel who have entered an appearance in Case. No. 05-1380 were served electronically in

accordance with  D.C. Local Civil Rule 5.4(d)(1).

_____/s/ Ryan E. Bull_____
Ryan E. Bull

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| *In re* Iraq and Afghanistan Detainees Litigation | ) ) ) |
| ───────────────────────────── | ) |
| ARKAN MOHAMMED ALI, *et al.*, | ) ) |
| Plaintiffs, | ) ) |
| v. | )      Case No. 05-1380-TFH |
| RICARDO S. SANCHEZ, | ) ) ) |
| Defendant. | ) ) |
| ───────────────────────────── | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF LIEUTENANT GENERAL RICARDO SANCHEZ'S MOTION TO
DISMISS AMENDED COMPLAINT**

STEPHEN L. BRAGA
(D.C. Bar No. 366727)
RYAN E. BULL
(D.C. Bar No. 481743)
JOSHUA KLEIN
BAKER BOTTS LLP
1299 Pennsylvania Ave., NW
Washington, D.C. 20004
(202) 639-7700

March 6, 2006

*Counsel for Lieutenant General Ricardo S. Sanchez*

## Table of Contents

FACTUAL ALLEGATIONS ................................................................................................1

ARGUMENT.....................................................................................................................4

I.   Attacks on LTG Sanchez's Implementation of Military Interrogation Policies in a
     Theater of War Constitute Nonjusticiable Political Questions...........................................5

II.  Plaintiffs' Constitutional Claims Against LTG Sanchez Have No Legal Foundation......10

     A.  Special Factors Preclude Extension of the Bivens Remedy to Foreign Nationals
         Detained Abroad by the U.S. Military During War .........................................................12

         1.   Finding a Private Right of Action for Military Detainees Would
              Impermissibly Infringe on the Military Decision-Making Process......................13

         2.   Finding a Private Right of Action for Military Detainees Would Infringe
              on the Executive Branch's National Security and Foreign Policy
              Prerogatives ........................................................................................................17

     B.  Plaintiffs Cannot State a Claim for Constitutional Violations .........................................20

         1.   The Eighth Amendment Applies Only to Convicted Criminals............................20

         2.   Non-Resident Aliens Captured and Detained During Military Operations
              in a Country Over Which the United States Does Not Exercise Exclusive
              Jurisdiction Have No Substantive Due Process Rights Under the Fifth
              Amendment .........................................................................................................21

     C.  LTG Sanchez Is Entitled to Qualified Immunity for the Conduct Alleged in the
         Complaint ....................................................................................................................24

III. The International Law and Treaty Claims Against LTG Sanchez in Counts III, IV,
     and V Must Be Dismissed Under the Westfall Act and for Failure to State a Claim........25

     A.  The Westfall Act Makes the United States, Not LTG Sanchez, the Proper Defendant
         for Counts III, IV, and V ...............................................................................................26

         1.   The Westfall Act Applies to Counts III, IV and V, Because Plaintiffs
              Complain of Acts Within the Scope of LTG Sanchez's Employment..................27

         2.   The International Law Claims in Counts III, IV and V Do Not Fall Within
              the Westfall Act's Specific, Limited Exceptions...................................................33

i

B.   Plaintiffs Have Failed to State a Claim for Damages Against LTG Sanchez Under
      International Law and the ATS ....................................................................................34

      1.   Counts III and IV Fail to State a Claim ...............................................................34

      2.   Count V Fails to State a Claim .............................................................................36

IV.   There Is No Claim for Declaratory Relief Against LTG Sanchez ....................................36

CONCLUSION ........................................................................................................................37

## Table of Authorities

### CASES

*32 County Sovereignty Comm. v. Dep't of State,*
  292 F.3d 797 (D.C. Cir. 2002)..............................................................................21

*Anderson v. Creighton,*
  483 U.S. 635 (1987) ...........................................................................................37

*\*Arar v. Ashcroft,*
  No. CV-04-0249, 2006 WL 346439 (E.D.N.Y. Feb. 16, 2005) ............................16, 18, 19

*Aulson v. Blanchard,*
  83 F.3d 1 (1st Cir. 1996)........................................................................................2

*Baker v. Carr,*
  369 U.S. 186 (1962) ...............................................................................5, 6, 8, 9

*Bancoult v. McNamara,*
  370 F. Supp. 2d 1 (D.D.C. 2004)....................................................................27, 28, 34

*Behrens v. Pelletier,*
  516 U.S. 299 (1996) ..........................................................................................24

*\*Bivens v. Six Unknown Fed. Narcotics Agents,*
  403 U.S. 388 (1971) ....................................................................................passim

*Bush v. Lucas,*
  462 U.S. 367 (1983) ..........................................................................................12

*Butera v. Dist. of Columbia,*
  235 F.3d 637 (D.C. Cir. 2001)..............................................................................20

*Carlson v. Green,*
  446 U.S. 14 (1980) ...........................................................................................12

*Chappell v. Wallace,*
  462 U.S. 296 (1983) ...............................................................................12, 14, 15

*Christopher v. Harbury,*
  536 U.S. 403 (2002) ..........................................................................................21

*Conley v. Gibson,*
  355 U.S. 41 (1957) ...........................................................................................37

*Correctional Servs. Corp. v. Malesko,*
    534 U.S. 61 (2001) ..............................................................................................12

*Davis v. Passman,*
    442 U.S. 228 (1979) ............................................................................................12

*Dep't of Navy v. Egan,*
    484 U.S. 518 (1988) ...............................................................................13, 17, 37

*El-Shifa Pharm. Indus. Co. v. United States,*
    378 F.3d 1346 (Fed. Cir. 2004) ..........................................................................15

*Elmaghraby v. Ashcroft,*
    2005 WL 2375202 (E.D.N.Y. 2005) ..............................................................27, 34

*Eminente v. Johnson,*
    361 F.2d 73 (D.C. Cir. 1966)...............................................................................10

*\*Gilligan v. Morgan,*
    413 U.S. 1 (1973) ......................................................................................6, 7, 10

*Gonzalez-Vera v. Kissinger,*
    No. 02-02240 (D.D.C. Sep. 17, 2004) ...............................................................27

*Haddon v. United States,*
    68 F.3d 1420 (D.C. Cir. 1995)..............................................................................30

*Haig v. Agee,*
    453 U.S. 280 (1981) ............................................................................................17

*Halperin v. Kissinger,*
    807 F.2d 180 (D.C. Cir. 1986)......................................................................10, 17

*Hamdan v. Rumsfeld,*
    415 F.3d 33 (D.C. Cir. 2005)...............................................................................36

*Hamdi v. Rumsfeld,*
    542 U.S. 507 (2004) ............................................................................................14

*Harbury v. Deutch,*
    233 F.3d 596 (D.C. Cir. 2000)..............................................................................21

*\*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) ............................................................................................24

*Hope v. Pelzer,*
    536 U.S. 730 (2002) ...........................................................................................25

*Howard University v. Best,*
    484 A.2d 958 (D.C. 1984) ...................................................................................32

*Ibrahim v. Titan Corp.,*
    391 F. Supp. 2d 10 (D.D.C. 2005)........................................................................10

*In re Guantanamo Detainee Cases,*
    355 F. Supp. 2d 443 (D.D.C. 2005)................................................................22, 25

*Ingraham v. Wright,*
    430 U.S. 651 (1970) ...........................................................................................21

*Jifry v. F.A.A.,*
    370 F.3d 1174 (D.C. Cir. 2004)...........................................................................21

*\*Johnson v. Eisentrager,*
    339 U.S. 763 (1950) ...............................................................................15, 21, 36

*Kashin v. Kent,*
    333 F. Supp. 2d 926 (S.D. Cal. 2004) .................................................................29

*\*Khalid v. Bush,*
    355 F. Supp. 2d 311 (D.D.C. 2005).................................................................13, 22, 25

*Lyon v. Carey,*
    533 F.2d 649 (D.C. Cir. 1976).............................................................................32

*Magellan Intern. Corp. v. Salzgitter Handel GmbH,*
    76 F. Supp. 2d 919 (N.D. Ill. 1999)......................................................................3

*Malley v. Briggs,*
    475 U.S. 335 (1986) ...........................................................................................24

*Massachusetts Sch. of Law at Andover v. Am. Bar Assoc.,*
    142 F.3d 26 (1st Cir. 1998)...................................................................................2

*Mosley v. Second New St. Paul Baptist Church,*
    534 A.2d 346 (D.C. 1987) .............................................................11, 20, 22, 30

*Nixon v. United States,*
    506 U.S. 224 (1993) .............................................................................................5

*North Dakota v. United States,*
  495 U.S. 423 (1990) ................................................................................................. 13

*Orloff v. Willoughby,*
  345 U.S. 83 (1953) .................................................................................................... 10

*Pauling v. McElroy,*
  278 F.2d 252 (D.C. Cir. 1960) .................................................................................. 21

*People's Mojahedin Org. v. Dep't of State,*
  182 F.3d 17 (D.C. Cir. 1999) .................................................................................... 21

*Ramey v. Bowsher,*
  915 F.2d 731 (D.C. Cir. 1990) .................................................................................. 32

*Rasul v. Bush,*
  542 U.S. 466 (2004) .................................................................................................. 22

*\*Rasul v. Rumsfeld,*
  No. 04-1864 (RMU), 2006 WL 266570 (D.D.C. Feb. 6, 2006) .................................*passim*

*Reid v. Covert,*
  354 U.S. 1 (1957) ...................................................................................................... 21

*Rodriguez v. Sarabyn,*
  129 F.3d 760 (5th Cir. 1997) .................................................................................... 29

*Sanchez-Espinoza v. Reagan,*
  568 F. Supp. 596 (D.D.C. 1983) ........................................................................ 1, 9, 38

*\*Sanchez-Espinoza v. Reagan,*
  770 F.2d 202 (D.C. Cir. 1985) ................................................. 9, 17, 18, 19, 37

*Schechter v. Merchants Home Delivery, Inc.,*
  No. 04-CV-1071, 2006 WL 300433 (D.C. Feb. 9, 2006) ......................................... 31

*Schneider v. Kissinger,*
  310 F. Supp. 2d 251 (D.D.C. 2004) ............................................ 7, 8, 16, 27, 28, 32

*\*Schneider v. Kissinger,*
  412 F.3d 190 (D.C. Cir. 2005) ............................................... 5, 6, 7, 8, 10

*Schweiker v. Chilicky,*
  487 U.S. 412 (1988) .................................................................................................. 12

*Sosa v. Alvarez-Machain,*
    542 U.S. 692 (2004) ................................................................29, 33, 34, 35, 36

*Stokes v. Cross,*
    327 F.3d 1210 (D.C. Cir. 2003)................................................................28

*Tarpeh-Doe v. United States,*
    28 F.3d 120 (D.C. Cir. 1994)................................................................29

*United States v. Smith,*
    499 U.S. 160 (1991) ................................................................34

*United States v. Stanley,*
    483 U.S. 669 (1987) ................................................................14, 15

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990) ................................................................14, 21, 23

*Weinberg v. Johnson,*
    518 A.2d 985 (D.C. 1986) ................................................................32, 36

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ................................................................13

## STATUTES

Fed. R. Evid. 106................................................................3

Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L.
    No. 108-375, 118 Stat. 1811, 2068-71 ................................................................16

National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, 119 Stat.
    3136, 3474-75................................................................16

10 U.S.C. § 801, stat. note § 1405(e)................................................................16

10 U.S.C. §§ 893, 923 ................................................................15

18 U.S.C. § 2441 ................................................................15

18 U.S.C. § 2441 ................................................................6

28 U.S.C. § 1350 ................................................................16

28 U.S.C. § 2679 ................................................................26, 27, 32, 33, 34

28 U.S.C.A. § 2241(e) ........................................................................................................ 16

## MISCELLANEOUS

United Nations' Resolutions 1483 (May 22, 2003), 1500 (August 14, 2003), 1511 (Oct. 16, 2003), 1546 (June 8, 2003) .......................................................................................... 23

Statement of President George H.W. Bush Signing H.R. 2092, 28 Weekly Comp. Pres. Doc. 465, 1992 U.S.C.C.A.N. 91, 92 (March 16, 1992) ........................................... 16, 35

Authorization For Use of Military Force Against Iraq Resolution of 2002, Pub. L. No. 107-243 (Oct. 16, 2002) ................................................................................................... 13

This is an unprecedented case. For the first time in history, to our knowledge, foreign citizens "detained in U.S. military custody"[1] in an overseas war zone[2] have sued U.S. military commanders while the war is ongoing to try to collect money damages from them in U.S. courts. Plaintiffs claim that actions of the U.S. military at Abu Ghraib and other prisons in Iraq "violate[] the U.S. Constitution, U.S.-ratified treaties including the Geneva Conventions, military rules and guidelines, the law of nations, and our fundamental values as a nation." Am. Compl. ¶ 4. That is a breathtaking scope for plaintiffs' desired litigation against "the highest-ranking U.S. military official in Iraq, with command and control over all U.S. military personnel serving there." Am. Compl. ¶ 28. No precedents support such sweeping damages claims by foreign detainees against a U.S. military commander during a time of war. But there are many, many precedents rejecting such distracting and vexatious litigation. The claims against LTG Sanchez should be dismissed immediately.

## FACTUAL ALLEGATIONS

At this stage of the proceedings, we are obligated to accept the allegations of the plaintiffs' amended complaint as true and we do so for purposes of this motion.[3] But in doing so, we must note at the outset that plaintiffs' prolix pleading employs a wide variety of accusatory language inconsistently. *Compare* Am. Compl. ¶ 1 (plaintiffs "were subjected to torture and other cruel, inhuman or degrading treatment or punishment, including severe and repeated beatings, cutting with knives, sexual humiliation and assault, confinement in a wooden box,

---

[1] Consolidated Amended Complaint For Declaratory Relief And Damages ("Am. Compl."), ¶ 1.

[2] The Amended Complaint cites "Iraq or Afghanistan" as the places where the plaintiffs were detained and released. Am. Compl. ¶ 1. With respect to Lieutenant General Sanchez ("LTG Sanchez"), only Iraq is relevant herein because it is only the Iraqi detainees in this litigation who were potentially subject to any action by LTG Sanchez in the course of his command. *See* Am. Compl. ¶ 28. Throughout the time period relevant to the Amended Complaint, Iraq was - and remains - an active and dangerous war zone.

[3] In reality, however, LTG Sanchez vigorously disputes the truth of many of the plaintiffs' factual allegations against him. But this is neither the time nor the place to air that dispute.

1

forcible sleep and sensory deprivation, mock executions, death threats, and restraint in contorted and excruciating positions") *with id.* ¶ 82 (the "September Sanchez Techniques included the use of dogs to exploit 'Arab fear of dogs,' isolation, stress positions, sleep deprivation, and environmental manipulation"); and *id.* ¶ 84 (the modified September Sanchez Techniques "continued to authorize interrogators to 'control' the lighting, heating, food, shelter, and clothing given to detainees"). Such varying allegations should naturally be distinguished analytically: a "mock execution" should not be treated the same as "control" of the "clothing given to detainees." But the Amended Complaint draws no such distinctions. In plaintiffs' unprincipled view, all conduct is apparently the same.

In addition, the Amended Complaint includes many "general" and "conclusory" allegations about LTG Sanchez. *See, e,.g.,* Am. Compl. ¶¶ 45-47. Courts have long recognized that such "footless conclusions" do nothing to aid judicial analysis of whether a plaintiff has stated a valid claim or not. 5B Wright and Miller, Federal Practice and Procedure (Civil 2d), § 1357 at 539 (2004). Or, as the First Circuit more colorfully put it, a "court need not 'swallow plaintiff's invective hook, line and sinker; bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like need not be credited.'" *Massachusetts Sch. of Law at Andover v. Am. Bar Assoc.*, 142 F.3d 26, 40 (1st Cir. 1998) (*quoting Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996)).

Finally, for present purposes, the Amended Complaint provides scant and inconsistent factual specifics as to any intentional, personal misconduct by LTG Sanchez. For example, in Paragraph 85, the plaintiffs allege that "[a]s a result of the proliferation of interrogation memoranda issued by Defendant Sanchez, military interrogators in Iraq became increasingly confused about the legal limits of their conduct toward detainees." It is conceivable

2

that multiple memoranda on any topic could engender some confusion in the minds of those receiving the memoranda. But the plaintiffs then take a quantum causation leap that is neither a fair nor rational inference: "*This confusion,*" allegedly created by Defendant Sanchez, "*caused the torture* and cruel, inhuman or degrading treatment of detainees." Am. Compl. ¶ 85 (emphasis added). Are we going to allow wartime litigation by foreign detainees to go forward, against the General in charge, over allegedly confusing memoranda?

Similarly, in Paragraph 145, the plaintiffs allege "[u]pon information and belief" that "throughout the period of time prior to January 2004 and thereafter, Defendants Sanchez, Karpinski and Pappas were personally present and witnessed abuse of detainees." That is a dramatic allegation to make against LTG Sanchez on "information and belief," especially when the next sentence of the Amended Complaint details the apparently thin factual basis for that belief: "[a] military lawyer asserted that Defendant Sanchez was personally present at Abu Ghraib during interrogations and *may* have witnessed abuse." (emphasis added). Are we going to allow wartime litigation by foreign detainees to go forward, against the General in charge, over a mere possibility like this one?

Finally, in Paragraph 163, the plaintiffs rely upon "[o]fficial investigative reports by Army Generals Taguba, Jones and Fay" in support of their allegations.[4] The investigations that led to those reports were ordered by LTG Sanchez. *See* Am. Compl. ¶164. Those were certainly strange orders to give if LTG Sanchez was part of a cabal aimed at torture as plaintiffs

---

[4] Plaintiffs' reliance on these reports is also selective. *See Magellan Intern. Corp. v. Salzgitter Handel* GmbH, 76 F. Supp. 2d 919, 923 (N.D. Ill. 1999) (applying Fed. R. Evid. 106 in considering a motion to dismiss). None of the investigations into the abuses at Abu Ghraib have found that General Sanchez promulgated or tolerated a policy of abuse for military detainees. *See, e.g,,* Jones-Fay Report, Executive Summary, p. 2 ("In the over-all scheme of [Operation Iraqi Freedom], the CJTF-7 Commander [LTG Sanchez] and staff performed above expectations."); Final Report of the Independent Panel to Review DoD Detention Operations ("Schlesinger Report"), August 2004, at p. 5 ("No approved procedures called for or allowed the kinds of abuses that in fact occurred [at Abu Ghraib]. There is no evidence of a policy of abuse promulgated by senior officials or military authorities.").

3

allege, rather than a conscientious commander discharging his duties.[5]    Recognizing this
inconsistency, plaintiffs therefore seek to attack LTG Sanchez for ordering these investigations
"only in relation to Abu Ghraib and only in relation to certain brigades and for certain time
periods." *Id.*  There could not be a more perfect example of Monday morning quarterbacking.
Are we going to allow wartime litigation by foreign detainees to go forward, against the General
in charge, over such 20/20 hindsight about what scope of investigation he should have ordered in
the theater of war?

At bottom, although plaintiffs strive mightily with inflammatory adjectives and
invective, the conglomeration of facts set forth in the Amended Complaint is manifestly
insufficient to support the Iraqi detainee plaintiffs' right to pursue their alleged claims for money
damages against LTG Sanchez in this Court.[6]

## ARGUMENT

No one, least of all the U.S. military, approves of the true abuses that occurred at
Abu Ghraib and other prisons in Iraq.  That is why LTG Sanchez ordered investigations into
those abuses, and why the military has prosecuted scores of individuals who were personally
responsible for such misconduct.  Those true abuses are indefensible.  But it is also indefensible
for the Iraq detainee plaintiffs to pursue the claims set forth in their Amended Complaint against
LTG Sanchez, seeking money damages from him in his personal capacity.  As set forth below,

---

[5]  LTG Sanchez gave those orders, of course, because he was not part of any such scheme.  Moreover, General
Sanchez recused himself from the investigative process so that the investigations could look at the role of his
command, if any, in the scandals.

[6]  Among the plaintiffs who have sued in this case are three — Siddiqi, Shirullah, and Rahman — who complain
only about their treatment in Afghanistan.  *See* Am. Compl. ¶¶ 177-180 (Siddiqi), ¶¶ 181-184 (Shirullah), ¶¶ 185-
188 (Rahman).  Because they were detained in Afghanistan and not Iraq, these plaintiffs point to no acts or
omissions by LTG Sanchez that could have caused injury to them.  It is clear that these three plaintiffs, therefore,
have utterly failed to state any claim against LTG Sanchez.

4

there is simply no sustainable jurisprudential basis for such claims, which fail on multiple, independent legal grounds.

## I.    Attacks on LTG Sanchez's Implementation of Military Interrogation Policies in a Theater of War Constitute Nonjusticiable Political Questions

Plaintiffs ask this Court to second-guess the strategic, tactical, and operational decisions made by the highest ranking military officer in a foreign theater of war, carrying out the orders and duties prescribed for him by the military's highest ranking civilian leaders. No U.S. court has ever entertained a lawsuit by private parties seeking to meddle so intrusively in the overseas operations of our military in wartime. This is precisely the kind of lawsuit the political questions doctrine was designed to address. The landmark case in this area is *Baker v. Carr*, 369 U.S. 186 (1962). Because at least five of the six classic indicators of political nonjusticiability identified in *Baker v. Carr* are inextricably intertwined with the allegations in this case, *see* 369 U.S. at 186,[7] the case must be dismissed for lack of jurisdiction.[8]

First and most importantly, our Constitution textually commits questions about the conduct of our Armed Forces in war to the political branches. *See Nixon v. United States,* 506 U.S. 224, 228 (1993) ("A controversy is nonjusticiable--*i.e.,* involves a political question -- where there is a 'textually demonstrable constitutional commitment of the issue to a coordinate political department . . . '"). It is Congress that has the power "To make Rules for the Government and Regulation of the land and naval Forces," Art. I, § 8, cl. X, "To provide for

---

[7] "Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion, or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker,* 369 U.S. at 217.

[8] Only one of these five potential indicators need be accepted by the Court for it to dismiss the case on political question grounds. *Schneider v. Kissinger,* 412 F.3d 190, 194 (D.C. Cir. 2005) ("To find a political question, we need only conclude that one [*Baker*] factor is present, not all.").

organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States," *id.*, and "To raise and support Armies" and "provide and maintain a Navy," *id.* Similarly, it is the President whom the Constitution makes "Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States." Art. II, § 2. Congress and the President have exercised their authority in precise ways. *See, e.g.*, 18 U.S.C. § 2441 (criminalizing war crimes); *see also infra*, n. 18 (discussing the Detainee Treatment Act of 2005). But they have not granted *private plaintiffs* a roving commission to take their grievances about the political branches' exercise of their oversight authority to courts. In asking this Court to pass judgment on the interrogation techniques utilized under LTG Sanchez's command at the behest of his civilian superiors — and on the command and control measures he put in place to detect and punish violations in the theater of war — plaintiffs seek judicial encroachment on the congressional powers of regulating and governing the armed forces, and on the presidential power to command them. *Cf. Gilligan v. Morgan*, 413 U.S. 1, 6 (1973) (finding nonjusticiable political question where plaintiffs sought judicial review of "the training, weaponry and orders of the [National] Guard," which the Court termed "critical areas of responsibility vested by the Constitution in the Legislative and Executive Branches . . .").[9]

Second, plaintiffs' lawsuit would embroil the courts in a dispute lacking "judicially discoverable and manageable standards." *Baker*, 369 U.S. at 217. In asking this Court to hold LTG Sanchez responsible not only for the orders he made about specific interrogation techniques, but also for his purported failure to more strictly supervise those under

---

[9] Plaintiffs' case would also interfere with the constitutional decision giving Congress the power "[t]o define and punish . . . Offences against the Law of Nations," Art, I, § 8, cl. x., and with the general structural decision to treat foreign affair questions as matters of politics, see *Schneider*, 412 F.3d at 194 ("'[F]oreign policy decisions are the subject of just such a textual commitment' as contemplated in *Baker v. Carr*." (citation omitted)).

his command as they developed their own protocols, plaintiffs ask the Court to select for itself from among the many "evolving methods of training, equipping, and controlling military forces with respect to their duties under the Constitution." *Gilligan*, 413 U.S. at 8.  Plaintiffs' case would require the court to evaluate the adequacy of military training for those who served at Abu Ghraib, the methods used to discipline lower-ranking officers, Compl. ¶ 155, 157, 159, and the Army's decision to assign various commands to its generals, Am. Compl. ¶ 159 — decisions that were made against the backdrop of fast-changing diplomatic and security needs in Iraq in the aftermath of the Coalition's invasion.  Cf. *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 262 (D.D.C. 2004) ("To gauge the reasonableness of these foreign policy decisions, the Court would have to measure and balance a myriad of thorny foreign and domestic policy considerations."), *aff'd on alternative grounds*, 412 F.3d 190 (D.C. Cir. 2005).  Plaintiffs would further have the Court determine the "necessary and adequate measures" to prevent not only torture *per se*, but also "degrading treatment," and they request a speculative inquiry into the identity of military officials under the General's "effective" command.  *See* Am. Compl. p. 83 (prayer for relief). Even "in the unlikely event that [a federal judge] possessed requisite technical competence to do so," it would be "inappropriate for [him] to undertake this responsibility." *Gilligan*, 413 U.S. at 8.  Plaintiffs' accusations would require the Courts to insert themselves into matters well beyond their ken: Simply put, "it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Id.* at 11.[10]

---

[10]  It does not matter that the plaintiffs purport to be making a legal case.  In affirming a dismissal under the political questions doctrine, the District Court recently noted that "recasting foreign policy and national security questions in tort terms does not provide standards for making or reviewing foreign policy judgments." *Schneider*, 412 F.3d at 197 (dismissing case as nonjusticiable).  The vague and uncertain law of international human rights — with no absolutely authoritative tribunals and little in the way of precedent — provides a much less manageable set of standards for U.S. courts than does ordinary tort law, much less the Uniform Code of Military Justice.

Third, decisions about the margins of acceptable interrogation policies, not to mention military resource management and training, depend on "initial policy determination[s] of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217. To the extent plaintiffs contend that LTG Sanchez authorized deviations from prior practice in order to implement Secretary Rumsfeld's decisions, it is enough to note that plaintiffs' own theory of the case postulates a policy decision, made at the highest levels of civilian and military leadership, that the war on terrorism generally, and the Iraqi war in particular, required special and innovative policies and practices. Cf. *Schneider*, 310 F. Supp. 2d at 261 ("Indeed, the plaintiffs' tort allegations go to the very heart of the political question doctrine: foreign policy directives from the President himself."). That fact confirms the folly of trying to resolve the issue in court: "To determine whether drastic measures should be taken in matters of foreign policy and national security is not the stuff of adjudication, but of policymaking." *Kissinger*, 412 F.3d at 197; cf. *Schneider*, 310 F. Supp. 2d at 263 (finding "initial policy determination" factor satisfied because, in judging plaintiffs' case "the Court would . . . have to consider whether preventing Dr. Allende from becoming President of Chile was worth supporting a rebel military faction that would likely commit human rights violations"). To the extent plaintiffs complain of LTG Sanchez's allegedly inadequate supervision of his subordinates, that too is essentially a policy question — about the extent to which a commander should direct his own and his subordinates' energies to the supervision of detainees as opposed to matters of battlefield strategy, or of nation-building, or of training troops to confront the new and deadly methods of warfare encountered in Iraq. As the political questions doctrine recognizes, the question of how to allocate military resources in the theater of war is committed to the political branches and their military experts, and LTG Sanchez

ultimately must answer to the American people's elected representatives, not to private plaintiffs in Court.

Fourth, military detention and interrogation policies in the Iraq war are already the subject of ongoing investigation and discussion in both the Executive and Legislative branches. They are simultaneously a serious and delicate issue in the Nation's foreign diplomacy. Discovery and trial on these issues during wartime and in the midst of these investigatory and diplomatic efforts could not occur without expressing a severe "lack of the respect due coordinate branches of government." *Baker*, 369 U.S. at 217. *See also Sanchez-Espinoza v. Reagan,* 568 F. Supp. 596, 602 (D.D.C. 1983), *aff'd on alternative grounds,* 770 F.2d 202 (D.C. Cir. 1985), (dismissing a case "replete with insurmountable obstacles to justifiability; not the least of which is the current debate and consideration of the issues presented here by both the Executive and Congress.").

Finally, with military operations ongoing, and while service members in Iraq continue to face daily deadly attacks, judicial review of the adequacy of the interrogation, detention, and internal oversight provisions made by LTG Sanchez would jeopardize the United States' war and foreign policy efforts and would create confusion about the scope of officers' authority within the military's chain of command — precisely the sort of "embarrassment from multifarious pronouncements by various departments on one question" that the Supreme Court has identified as an underlying concern of the political questions doctrine. See *Baker*, 369 U.S. at 217. With our foreign relations and ability to prosecute the Iraqi war at stake, private plaintiffs cannot be allowed to interject confusion into circumstances that "demand [a] single-voiced statement of the Government's views." *Baker*, 369 U.S. at 211.

Although any one of these factors in isolation would be sufficient to require dismissing this case as nonjusticiable, *Schneider*, 412 F.3d at 194, they are surely fatal in combination. Plaintiffs would substitute judicial oversight in the place of "professional military judgments" and "the civilian control of the Legislative and Executive Branches." *Gilligan*, 413 U.S. at 10. They ask the courts to second-guess "complex, subtle, and professional decisions" on military tactics — and ask for this intrusion not after the conclusion of fighting, but in the very midst of war. *Id.* But "judges are not given the task of running the Army." *Orloff v. Willoughby,* 345 U.S. 83, 93-94 (1953). By rebuffing private plaintiffs' efforts to drag the courts into political disputes, the courts faithfully serve our constitutional design.[11] In *Eminente v. Johnson,* 361 F.2d 73 (D.C. Cir. 1966) (per curiam), the D.C. Circuit dismissed as nonjusticiable an action for damage to property resulting from U.S. armed forces' actions in a foreign country. This Court should do the same here, and dismiss the Amended Complaint.

## II.    Plaintiffs' Constitutional Claims Against LTG Sanchez Have No Legal Foundation

In their first and second causes of action, plaintiffs assert, under the authority of *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), private rights of action against LTG Sanchez to vindicate alleged violations of rights that they, as foreign citizens of Iraq, allegedly hold under the Fifth and Eighth Amendments of the United States Constitution.[12] More specifically, in their first cause of action, plaintiffs allege that LTG Sanchez's "actions, orders, authorizations, approvals and omissions *caused* the torture and abuse of Plaintiffs" in the

---

[11] There is one recent decision in this District rejecting the political questions argument in a suit against a private contractor at Abu Ghraib. See *Ibrahim v. Titan Corp.,* 391 F. Supp. 2d 10 (D.D.C. 2005). In reaching that conclusion, however, Judge Robertson specifically emphasized that the fact that the suit was against *"private* parties" made it distinguishable from *Kissinger,* where the D.C. Circuit dismissed a suit brought against a government officer. *Id.* at 16 (emphasis added). That distinction is, of course, inapposite herein and *Kissinger* should therefore control.

[12] In *Bivens*, the Supreme Court held that a U.S. citizen could state a cause of action against a government official who, acting under color of federal law, alleged violated the plaintiff's rights under the Fourth Amendment. *Bivens*, 403 U.S. at 396. The Court stressed, however, that no such cause of action would be created if there were "special factors counseling hesitation in the absence of affirmative action by Congress." *Id.*

10

Iraqi war zone, and that the "actions, orders, authorizations, approvals and omissions" therefore violated the due process clause of the Fifth Amendment. Am. Compl. ¶ 238 (emphasis added). In their second cause of action, plaintiffs contend that LTG Sanchez violated the Fifth and Eighth Amendments of the Constitution by "*allowing* torture, or other cruel, inhuman or degrading treatment or punishment or other treatment that constitutes deprivation of basic human needs such as food and reasonable safety, and the unnecessary and wanton infliction of pain on any person in U.S. custody or control." *Id.* ¶ 243 (emphasis added).[13]

Plaintiffs' unprecedented constitutional tort claims fail for three independent reasons. *First*, "special factors" preclude extension of the *Bivens* remedy to non-resident aliens detained by the U.S. military in overseas war zones. Recognizing such a cause of action would improperly entangle the judiciary in military judgments concerning the allocation of combat resources in a war zone, and create the risk of undue judicial interference in national security and foreign policy arenas that are committed by the Constitution to the political branches. For these reasons, the political branches have declined to create a civil remedy for foreign aliens against U.S. military officers in such circumstances. *Second*, even if a *Bivens* remedy were available in this context, it is well-established that the Eighth Amendment has no application when, as in this case, the alleged violations occurred prior to criminal conviction. Moreover, plaintiffs — as foreign aliens who have never entered the United States or any territory exclusively controlled by the United States — have no standing to seek money damages from U.S. military officials for the alleged violation of due process rights afforded under the Fifth Amendment. *Third*, even if

---

[13] Plaintiffs seek to impose supervisor or command liability on LTG Sanchez insofar as he allegedly "authorized, ratified, and failed to stop and prevent" abusive treatment by his indirect subordinates within the Iraqi war theater. *Id.* ¶ 244; *see also id.* ¶ 239 (alleging in Count I that LTG Sanchez "acted with reckless and deliberate indifference" to his "subordinates' unconstitutional actions."); ¶ 245 ("Defendants had power to formulate policies relating to the treatment and interrogation of detainees, and exercised that power to generate illegal practices, namely, the torture and other cruel, inhuman or degrading treatment of detainees in Iraq and Afghanistan."); ¶ 246 ("Defendants acted with deliberate indifference and conscious disregard of the high likelihood of injury, and failed to take steps to prevent subordinates from engaging in such conduct.").

plaintiffs could identify actual constitutional rights, LTG Sanchez is protected from liability by the doctrine of qualified immunity because the alleged rights are not clearly established today, much less during LTG Sanchez's tenure as the commanding officer of the Iraqi war zone from June 2003 until July 2004.

### A.    Special Factors Preclude Extension of the *Bivens* Remedy to Foreign Nationals Detained by the U.S. Military During War

In *Bivens* itself, the Supreme Court cautioned that a private right of action for money damages under the Constitution "will not be available when 'special factors counseling hesitation' are present." *Chappell v. Wallace*, 462 U.S. 296, 298 (1983) (*quoting Bivens*, 403 U.S. at 396). In assessing whether special factors preclude extension of a *Bivens* remedy into a new context, the Court has focused not on "the merits of the particular remedy . . . sought" but instead on "the question of who should decide whether such a remedy should be provided." *Bush v. Lucas*, 462 U.S. 367, 380 (1983). Only twice in the last 35 years has the Supreme Court decided that the judiciary — as opposed to the political branches — was best-positioned to create a private right of action: *Davis v. Passman*, 442 U.S. 228 (1979) and *Carlson v. Green*, 446 U.S. 14 (1980).[14] In both cases, as in *Bivens* itself, "the Court found that there were no 'special factors counseling hesitation in the absence of affirmative action by Congress,' no explicit statutory prohibition against the relief sought, and no exclusive statutory alternative remedy." *Schweiker v. Chilicky*, 487 U.S. 412, 421 (1988). Such findings are not possible in this case. Multiple special factors, including the Supreme Court's repeated refusal to allow judicial

---

[14]    In *Davis*, the Court recognized that a U.S. citizen could bring a private right of action against her employer, a member of Congress, for alleged gender discrimination in violation of the Fifth Amendment. 442 U.S. at 246-47. In *Carlson*, the Court held that a prisoner incarcerated in a federal prison could assert a private right of action against prison officials alleged to have consciously deprived him of necessary medical care in violation of the Eighth Amendment. 446 U.S. at 20-22. Since *Carlson*, the Supreme Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants." *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001); *see also Schweiker v. Chilicky*, 487 U.S. 412, 422 (1988) (explaining that the Court has "responded cautiously to suggestions that *Bivens* remedies be extended into new contexts.").

intermeddling in military decision-making, the compelling need to preserve the Executive Branch's constitutional authority to protect the national security, as well as the explicit refusal of the political branches to create precisely the cause of action sought by plaintiffs, compel this Court not to extend the *Bivens* remedy to foreign civilians detained abroad by the armed forces during combat actions.

      *1.    Finding a Private Right of Action for Military Detainees Would Impermissibly Infringe on the Military Decision-Making Process*

      Out of respect for the constitutional delegation of war powers to the political branches, *see* Const. Art. I, § 8; Art. II, § 2, the judiciary has long been reluctant to meddle in military decision-making. *See, e.g., North Dakota v. United States*, 495 U.S. 423, 443 (1990) ("When the Court is confronted with questions relating to . . . military operations, we properly defer to the judgment of those who must lead our Armed Forces in battle."); *Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988) ("[U]nless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) (ascribing "broad powers [to] military commanders engaged in day-to-day fighting in a theater of war"); *Khalid v. Bush,* 355 F. Supp. 2d 311, 320-22, 329 (D.D.C. 2005) (Leon, J.) ("[T]he Court's role in reviewing the military's decision to capture and detain a non-resident alien is, and must be, highly circumscribed."), *appeal docketed*, No. 05-5063 (D.C. Cir. March 4, 2005).[15] To avoid undue interference, the Supreme Court has refused to allow members of the armed forces to pursue a *Bivens* remedy against their military superiors because such actions could corrupt

---

[15]  This judicial deference is at its highest point when, as it has in Iraq, the Executive engages in military operations pursuant to authorization from Congress. *See Youngstown Steel*, 343 U.S. at 635-37 & n.2 (Jackson, J., concurring); *see also* Authorization For Use of Military Force Against Iraq Resolution of 2002, Pub. L. No. 107-243 (Oct. 16, 2002) (authorizing the President to use the Armed Forces of the United States as he determines necessary to "defend the national security of the United States against the continuing threat posed by Iraq" and "enforce all relevant United Nations Security Council resolutions regarding Iraq.")

"the necessarily unique structure of the military establishment." *Chappell*, 462 U.S. at 300 (holding that special factors precluded soldiers' claims of race discrimination against their superior officers). In *United States v. Stanley*, 483 U.S. 669 (1987), the Court reiterated that no *Bivens* cause of action could be recognized based on conduct "incident to service" in the armed forces because any such action "would call into question military discipline and decision-making" and, thereby, "require judicial inquiry into, and hence intrusion upon, military matters." *Id.* at 681. In declining to afford a *Bivens* remedy, the Court stressed that whether the plaintiff had an adequate remedy for the alleged injury was irrelevant to special factors analysis. *Id.* Rather, "[t]he 'special facto[r]' that 'counsel[s] hesitation' is . . . the fact that congressionally uninvited intrusion into military affairs by the judiciary is inappropriate. . . ." *Id.* at 683.

Empowering foreign aliens to bring *Bivens* actions against military officers during time of war will no less require "judicial inquiry into, and hence intrusion upon, military matters" than would empowering U.S. soldiers to bring such actions in times of peace. Indeed, the ramifications of such an unprecedented extension of the *Bivens* are breathtaking.[16] Such actions would embroil the judiciary in battlefield decision-making, forcing military commanders in the field to weigh the threat of *Bivens* liability when allocating military resources between combat and detainee operations. For example, a *Bivens* claim such as the one alleged against LTG Sanchez that is predicated on alleged command deficiencies would put the judiciary in the position of evaluating, and ultimately shaping, how military commanders balance their supervisory resources during combat operations, e.g. how much energy and resources should be

---

[16] The ramifications of such an extension would also be pervasive since "[t]he capture and detention of lawful combatants, and the capture, detention and trial of unlawful combatants, by universal agreement and practice, are important incidents of war." *Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004) (internal citations and quotations omitted); *see also Verdugo-Urquidez*, 494 U.S. at 273 (indicating that the United States has entered armed conflicts more than 200 times in its history). For example, the Schlesinger Report cited in plaintiffs' Amended Complaint indicates that Abu Ghraib prison alone held more than 7,000 detainees in October of 2003. *See* Schlesinger Report at 11.

devoted to force protection operations as opposed to detainee operations. The possibility of such suits by civilians detained for security operations creates an inappropriate incentive for senior military leaders to reduce the risk of suit by assigning the most experienced and competent officers to supervise those arenas most likely to give rise to litigation involving foreign aliens, diverting such talent from supervision of direct combat and force protection operations in which the lives of American soldiers are at stake.[17] *Chappell* and *Stanley* instruct that these are precisely the kinds of military judgments that must be made by military professionals unfettered by the potential for second-guessing by the Judiciary.[18] *C.f. El-Shifa Pharm. Indus. Co. v. United States*, 378 F.3d 1346, 1369 (Fed. Cir. 2004), *cert denied*, 125 S.Ct. 2693 (2005) ("[W]e are loathe to add to the President's calculus concerns regarding [constitutional] liability when he exercises his power as Commander-in-Chief.")

Moreover, allowing foreign civilians detained for security purposes by the U.S. military during combat operations abroad to seek money damages from senior military and civilian officials would empower those forces allied against the U.S. to harass and cajole the commanders responsible for our military campaign, and thereby diminish their prestige in the field. As the Supreme Court cautioned in *Johnson v. Eisentrager*, 339 U.S. 763, 774, 778-79 (1950), "[i]t would be difficult to devise more effective fettering [of war time security] . . . than

---

[17] It is important to note that the Uniform Code of Military Justice ("UCMJ") already criminalizes torture and abuse of the kind alleged by plaintiffs, *see* 10 U.S.C. §§ 893, 923, and that military regulations provide that commanders can be held accountable for war crimes that they direct or enable. *See* U.S Army Field Manual 27-10, § 501; *see also* 18 U.S.C. § 2441. As of May 2005, the Army reported that allegations of detainee mistreatment against more than 130 military members had been addressed in courts-martial, non-judicial punishments, and other adverse administrative actions. *See* http://www4.army.mil/ocpa/read.php?story_id_key=7293 (visited March 3, 2006). Although officers comprise only approximately 16% of the total Army force, approximately 25% of the punishments imposed through these actions as of May 2005 had been applied against officers. *Id.*

[18] Because the judiciary is not well-equipped to make these kinds of policy judgments, inter-branch conflict over war-related policies is likely to develop. Not only could such conflict affect the lives of U.S. men and women in the field, it may also give comfort to those forces allied against the United States in the war on terror. *See Eisentrager*, 339 U.S. at 779 ("Nor is it unlikely that the result of such enemy litigiousness would be a conflict between judicial and military opinion highly comforting to the enemies of the United States.").

to allow the very enemies [being fought] to call [commanders] to account in [the commanders'] own civil courts." If foreign civilians are to be empowered to interfere with military operations, and potentially place the lives of U.S. service men and women in greater risk of harm, it must be the political branches, not the Judiciary, that makes that judgment.

Both the Executive and Legislative Branches have considered the risks inherent to authorizing non-resident aliens to bring civil actions alleging torture against U.S. military officials and have refused to authorize such actions. In 1992, Congress passed and the President signed the Torture Victims Protection Act ("TVPA"), which creates a private cause of action for foreign aliens to remedy torture, but imposes civil liability only on an individual acting "under actual or apparent authority, or color of law, of any *foreign* nation." 28 U.S.C. § 1350, stat. note § 2(a) (emphasis added); *see also Schneider*, 310 F. Supp. 2d at 267. Reinforcing the scope of the TVPA, President George H.W. Bush signed the law based on his understanding that "the Act does not permit suits for alleged human rights violations in the context of United States military operations abroad." Statement of President George H.W. Bush Signing H.R. 2092, 28 Weekly Comp. Pres. Doc. 465, 1992 U.S.C.C.A.N. 91, 92 (March 16, 1992). No legislation has been passed by Congress since 1992 creating such a right of action, and this Court should be guided by Congress' hesitation in refusing to create one now.[19] *See Arar v. Ashcroft*, No. CV-04-0249, 2006 WL 346439, *29 (E.D.N.Y. Feb. 16, 2005) (finding special factors precluded a *Bivens*

---

[19] Similarly, Congress has addressed the proper treatment of foreign aliens detained abroad in the two most recent defense authorization bills: (i) the National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, 119 Stat. 3136, 3474-75 (to be codified at 10 U.S.C. § 801, note and 42 U.S.C. § 2000dd) (the "2006 Defense Authorization Act"), and (ii) the Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, 118 Stat. 1811, 2068-71 (codified at 10 U.S.C. § 801, stat. note § 1092) (the "Reagan Act"). In neither bill did Congress create a private right of action for foreign aliens to seek money damages from military commanders. In fact, the Detainee Treatment Act of 2005, included with the 2006 Defense Authorization Act, divests federal courts of jurisdiction to consider any action against the United States or its agents relating to the detention by the Department of Defense of aliens at Guantanamo Bay other than as provided for within the Act. *See* 28 U.S.C.A. § 2241(e), as amended January 6, 2006; 10 U.S.C. § 801, stat. note § 1405(e). It would be peculiar indeed for this Court to afford foreign aliens detained and released in Iraq broader rights to our Courts than Congress has granted to those currently detained by the United States in Cuba.

remedy for foreign alien allegedly delivered by U.S. officials to Syria and tortured by Syrian authorities, and noting the absence of Congressional action to create a private right of action for renditions and Congress' withholding of a private cause of action under the TVPA).

All of these factors compel this Court not to extend the *Bivens* remedy to foreign aliens detained by the United States military on overseas battlefields. Whether, and to what extent, the United States should afford a remedy to foreign civilians detained abroad by the U.S. military for security reasons is a matter of policy best left to the political branches.

> 2.    *Finding a Private Right of Action for Military Detainees Would Infringe on the Executive Branch's National Security and Foreign Policy Prerogatives*

Beyond the risk that *Bivens* actions by foreign nationals would pose to military decision-making during combat operations, extending a judicial remedy to foreign aliens detained in combat operations would (i) improperly dilute the authority of the Executive to safeguard the nation from the threat of terrorism, and (ii) interfere with the administration's coordination of foreign policy and counter-terrorism strategies. As with military decision-making, courts have traditionally deferred to the Executive Branch on national security and foreign affairs matters. *See, e.g., Egan*, 484 U.S. at 530; *Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."); *Halperin v. Kissinger*, 807 F.2d 180, 187 (D.C. Cir. 1986) (explaining that the "harm produced" by assertion of damages actions against federal officials "is particularly severe in the national security field, since 'no governmental interest is more compelling'"); *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 209 (D.C. Cir. 1985) ("the special needs of foreign affairs must stay our hand in the creation of damage remedies [under *Bivens*] against military and foreign policy officials for allegedly unconstitutional treatment of foreign subjects causing injury abroad."). Courts have consistently refused to extend the *Bivens* remedy into contexts, like the

one presented in this case, that would place the judiciary squarely in the midst of national security and foreign policy matters.

Applying this principle in *Sanchez-Espinoza*, the D.C. Circuit declined to create a damage remedy for Nicaraguan citizens against U.S. military and foreign policy officials allegedly responsible for unconstitutional treatment suffered by the plaintiffs in Nicaragua. The Court recognized "as a general matter" that "the danger of using the courts in situations such as this is sufficiently acute that we must leave to Congress the judgment whether a damage remedy should exist." *Sanchez-Espinoza*, 770 F.2d at 209. Similarly, in a recent case brought by a Syrian native detained by the United States and transferred to Syria where he alleges that he was tortured by Syrian authorities, the Eastern District of New York held that special factors precluded extension of a *Bivens* remedy. *See Arar*, 2006 WL 346439, * 29-*31. The Court noted that success in the ongoing war against terrorism "requires coordination between law-enforcement and foreign policy officials" and involves "complex relationships with foreign governments." *Id.* at *29. Extending a *Bivens* remedy into such a context "could significantly disrupt the ability of the political branches to respond to foreign situations involving our national interest," *Id.* (citing *United States v. Verdugo-Urguidez*, 494 U.S. 259, 273-74 (1990)), by, for example, chilling foreign governments that might support U.S. intelligence efforts out of concern that discovery would make public their involvement in U.S. national security operations. In addition, the Court explained that in contrast to domestic situations in which judges have both constitutional authority and experience to evaluate government decision-making, most judges "have neither the experience nor the background to adequately and competently define and adjudge the rights of an individual vis-a-vis the needs of officials acting to defend the sovereign

interests of the United States, especially in circumstances involving countries that do not accept our nation's values or may be assisting those out to destroy us." *Id.* at * 30.

Just as the courts in *Sanchez-Espinoza* and *Arar* declined, out of deference to the authority of the political branches over national security and foreign relations issues, to create a *Bivens* remedy for foreign nationals allegedly subject to abusive treatment overseas, so too this Court should refuse to create a *Bivens* remedy for Iraqi nationals detained by the U.S. military during combat operations in Iraq. Beyond the security operations in Iraq during which men and women of the U.S. military risk their lives on a daily basis to bring stability to the people of Iraq, U.S. involvement in Iraq now has profound counter-terrorism implications. It is clear, for example, that international terrorists, led by Abu Musab al-Zarqawi, now use Iraq as a base from which to conduct terrorist operations in concert al Qaeda forces. *See* http://www.dni.gov/release_letter_101105.html (visited on February 22, 2006) (Office of the Director of National Intelligence Press Release No. 2-05 concerning recovery of correspondence between al Qaeda to Mr. al-Zarqawi). U.S. operations and interrogation policies in Iraq are now inextricable from Executive Branch counter-terrorism efforts intended to protect the homeland. Mixing a *Bivens* right of action into those operations will place the Judiciary squarely in the middle of complex intelligence-gathering policy — a role that the Judiciary is ill-equipped to fill. Such judicial intervention could quickly lead to "'embarrassment of our government abroad' through 'multifarious pronouncements by various departments on one question.'" *Sanchez-Espinoza*, 770 F.2d at 209 (quoting *Baker*, 369 U.S. at 226).

Moreover, as in *Sanchez-Espinoza*, Iraqi nationals, armed with a *Bivens* right of action, could use that right of action "to obstruct the foreign policy of our government." Such obstruction could occur in any number of ways, including the filing and publication of *Bivens*

claims to advance anti-American propaganda and cast aspersions on the U.S. military and civilian leadership in Iraq. In addition, the discovery process available in a *Bivens* action would enable to foreign aliens to inquire of military officials about the rationale for their conduct and decision-making in the field, potentially enabling those hostile to the United States to improve their tactics.

It is to avoid pitfalls such as these that the Constitution assigns national security and foreign policy matters to the political branches of government. The need to respect that Constitutional commitment is a special factor that requires this Court to abstain from extending a *Bivens* remedy to Iraqi nationals detained temporarily by the United States military.

**B.     Plaintiffs Cannot State a Claim for Constitutional Violations**

Even if special factors did not preclude the Court from extending a *Bivens* remedy to foreign aliens detained by the U.S. military abroad, plaintiffs' *Bivens* claims against LTG Sanchez must be dismissed because they fail to articulate an actionable constitutional right. *See Butera v. Dist. of Columbia*, 235 F.3d 637, 646 (D.C. Cir. 2001). *First*, the Eighth Amendment has no application where, as here, plaintiffs have not been convicted of or sentenced for a crime. *Second*, plaintiffs Arkan Mohammed Ali, Thahe Mohammed Sabar, Sherzad Kamal Khalid, Ali H., and Najeeb Abbas Ahmed, all Iraqi nationals who are not alleged to have even entered the United States (Am. Compl. ¶¶ 17-21), have no standing to assert affirmatively alleged rights under the Fifth Amendment as a basis to recover money damages.

*1.     The Eighth Amendment Applies Only to Convicted Criminals*

In their second cause of action, plaintiffs assert claims against LTG Sanchez pursuant to the Eighth Amendment. Even assuming that the plaintiffs may assert the protections of the Eighth Amendment based on conduct that took place abroad, the Eighth Amendment only "protects individuals convicted of crimes from punishment that is cruel and unusual;" it does not

20

afford rights to individuals detained for security reasons prior to trial. *See Ingraham v. Wright*, 430 U.S. 651, 671-72, n. 40 (1970); *Rasul v. Rumsfeld*, No. 04-1864 (RMU), 2006 WL 266570, *13 n.16 (D.D.C. Feb. 6, 2006). The complaint acknowledges that plaintiffs were not tried and convicted of crimes and that the alleged violations "occurred . . . without an adjudication of guilt." Am. Compl. ¶ 244. Therefore, any entitlement to the constitutional rights claimed by the plaintiffs might only be found in the Fifth Amendment.

> 2.    *Non-Resident Aliens Captured and Detained During Military Operations in a Country Over Which the United States Does Not Exercise Exclusive Jurisdiction Have No Substantive Due Process Rights Under the Fifth Amendment*

The Supreme Court has rejected the basic premise underlying plaintiffs' first and second causes of action — "that the Fifth Amendment confers rights upon all persons, whatever their nationality, wherever they are located and whatever their offenses." *Johnson*, 339 U.S. at 783; *Verdugo-Urquidez*, 494 U.S. at 269 ("[W]e have rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States.") (citing *Johnson*, 339 U.S. at 784); *compare Reid v. Covert*, 354 U.S. 1, 5 (1957) (holding that U.S. citizens stationed abroad may invoke rights under the Fifth and Sixth Amendments, and may not be constitutionally tried under the Uniform Code of Military Justice for capital crimes). The D.C. Circuit has repeatedly implemented the Supreme Court's guidance on this issue, recognizing that a "foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise." *32 County Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002) (quoting *People's Mojahedin Org. v. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999)).[20] The current state of the law in this Circuit forecloses the assertion by Iraqi

---

[20] *See also Jifry v. F.A.A.*, 370 F.3d 1174, 1182 (D.C. Cir. 2004) ("The Supreme Court has long held that non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections."); *Harbury v. Deutch*, 233 F.3d 596, 604 (D.C. Cir. 2000), *rev'd on other grounds sub nom.*

21

nationals of substantive due process rights under the Fifth Amendment for alleged misconduct by U.S. military officials *in Iraq*.

Notwithstanding the clarity of the law on this issue in the D.C. Circuit, it appears that plaintiffs intend to argue that the Supreme Court's 2005 decision in *Rasul v. Bush*, 542 U.S. 466 (2004), establishes that aliens detained by the U.S. military have substantive due process rights if they are held within the functional equivalent of U.S. territory.[21]  Plaintiffs would be wrong.  *First*, the Court in *Rasul* did not address whether aliens detained by the United States military have independent constitutional rights, only whether the habeas statute confers U.S. courts with jurisdiction to hear claims concerning the viability of ongoing detention: "[w]hat is presently at stake is only whether the federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing."[22]  *Id.* at 485.  *Second*, *Rasul* presented claims by detainees held by the United States at Guantanamo Bay Naval Base in Cuba, where, the Court explained, "the United States exercises 'complete jurisdiction and control' . . ., and may continue to exercise such control permanently if it so chooses."  *Id.* at 480.  The United States does not exercise "complete

---

Christopher v. Harbury, 536 U.S. 403 (2002) (affirming holding that wife of Guatemalan national allegedly tortured in Guatemala could not assert substantive due process claims against U.S. officials allegedly involved in the torture); *Pauling v. McElroy*, 278 F.2d 252, 254 n. 3 (D.C. Cir. 1960) ("non-resident aliens . . . plainly cannot appeal to the protection of the Constitution or laws of the United States.").

[21]  In *Rasul*, the Supreme Court considered the discrete issue of "whether United States courts lack jurisdiction to consider challenges to the legality of the detention of foreign nationals captured abroad in connection with hostilities and incarcerated at Guantanamo Bay Naval Base, Cuba" 542 U.S. at 470.  Petitioners were Australian and Kuwaiti citizens captured during hostilities in Afghanistan. *Id.*

[22]  Courts in this District have disagreed as to "whether and what further proceedings" are necessary to decide habeas petitions filed by detainees at Guantanamo Bay.  In *Khalid v. Bush*, Judge Leon held that "[n]on-[r]esident aliens [c]aptured and [d]etained [o]utside the United States [h]ave [n]o [c]ognizable [c]onstitutional [r]ights." *Khalid* 355 F. Supp. 2d at  Just two weeks after Judge Leon's decision in *Khalid*, Judge Hens Green reached the opposite conclusion, holding that (i) after *Rasul*, "Guantanamo Bay must be considered the equivalent of a U.S. territory in which fundamental constitutional rights apply," and therefore (ii) Guantanamo detainees may assert "the right not to be deprived of liberty without due process of law." *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 464 (D.D.C. 2005).  Appeals from both decisions have been briefed and argued to the D.C. Circuit.  On March 22, 2006, the D.C. Circuit is scheduled to hear argument concerning the impact of the Detainee Treatment Act of 2005 on the appeals. *See supra*, note 18.

22

jurisdiction and control" in Iraq, and has no permanent autonomy in that country.  To the contrary, since the invasion of Iraq, not only our own government, but also the governments of Great Britain and the other coalition partners, as well as the United Nations, have consistently reaffirmed "the sovereignty and territorial integrity of Iraq."  *See, e.g.*, United Nations' Resolutions 1483 (May 22, 2003), 1500 (August 14, 2003), 1511 (Oct. 16, 2003), 1546 (June 8, 2003); 1557 (August 12, 2004).  Iraq is now governed by an independently-elected representative body and subject to a  constitution ratified by a two-thirds majority of the Iraqi people.  Iraq is not, and has never been, within the territorial jurisdiction of the United States. *Third*, plaintiffs are not subject to continued detention by the U.S. military.  As a consequence, the Supreme Court's decision in *Rasul*, and the entire line of Guantanamo Bay habeas cases, are of dubious relevance to plaintiffs' actions for monetary relief.

Whatever limitations the Constitution may place on the Executive's authority to detain aliens on territory controlled exclusively by the United States (and whatever procedural protections the Constitution may require the Executive to afford such individuals), extending the substantive rights of the Fifth Amendment to foreign aliens who have never entered the United States  would have significant and deleterious consequences for the United States.  For example, in *Verdugo-Urquidez*, the Supreme Court explained that applying Fourth Amendment rights when the U.S. military is employed abroad "for the protection of American citizens or national security . . . . could significantly disrupt the ability of the political branches to respond to foreign situations involving our national interest."  494 U.S. at 273-74 (internal citations omitted).[23]  The same risk of significant disruption would be created by the extension of substantive due process

---

[23] The Court also indicated that the "special factors" analysis required by *Bivens* may be insufficient to remedy this risk because "the Government would still be faced with case-by-case adjudications concerning the availability of such an action." *Id.*

rights under the Fifth Amendment. There is no principled basis for any distinction between the two amendments in this regard.

In sum, an unbroken line of Supreme Court and D.C. Circuit precedent has declined to extend the protections of the U.S. Constitution to aliens not present within the territorial jurisdiction of the United States. Plaintiffs' efforts to secure such rights based on the presence of the U.S. military in Iraq are unsustainable. For that reason, plaintiffs' Constitutional claims must be dismissed.

## C. LTG Sanchez Is Entitled to Qualified Immunity for the Conduct Alleged in the Complaint

The doctrine of qualified immunity protects public officials from personal liability for their discretionary acts, if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *accord Behrens v. Pelletier*, 516 U.S. 299, 305 (1996). The doctrine seeks to minimize "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Harlow*, 457 U.S. at 814. Only acts that unambiguously violate a constitutional or statutory right give rise to personal liability. *See id.* at 818. Qualified immunity "provides ample protection to all but . . . those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

LTG Sanchez is plainly entitled to qualified immunity on plaintiffs' constitutional claims against him in the first and second causes of action of the Amended Complaint. Both claims seek to hold LTG Sanchez personally liable for violating alleged constitutional rights of foreign citizens detained in U.S. military custody in an overseas war zone. For the many reasons already specified above, it is hardly even established — let alone "clearly established" — that those constitutional rights extend to such non-citizens abroad. *See supra* at 20-22. Perhaps the

24

plainest proof of this point comes from fellow judges on this very district court bench. On January 17, 2005, Judge Richard Leon issued a decision in *Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005) holding that non-resident aliens captured and detained outside the United States had no cognizable constitutional rights. Two weeks later, Judge Joyce Hens Green issued a decision in *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005) holding that such non-resident aliens had some cognizable constitutional rights. The split in those decisions has yet to be resolved, but for present purposes the mere fact that two respected federal district judges on the very same court could see the issue so entirely differently in 2005 — long after the detainee abuses alleged in this case ended — is dispositive. *See Rasul*, 2006 WL 266570, at *14-15 (granting military officials qualified immunity from suit by Guantanamo Bay detainees because the law did not clearly establish that constitutional protections applied to such detainees in 2004). A legal theory on which the courts are split self-evidently cannot give birth to a "clearly established" constitutional right.[24]

### III.  The International Law and Treaty Claims Against LTG Sanchez in Counts III, IV, and V Must Be Dismissed Under the Westfall Act and for Failure to State a Claim

Counts III, IV, and V of the Complaint seek damages from LTG Sanchez based on alleged violations of international law and treaty. These counts must be dismissed for two reasons. First, Congress has conferred absolute immunity on officers like LTG Sanchez, by making the United States the exclusive defendant for non-constitutional, non-statutory claims like the plaintiffs'. Second, plaintiffs' allegations — even if true — would not amount to violations entitling them to damages under U.S. law.

---

[24] *Cf. Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (to negate qualified immunity, the conduct's "unlawfulness must be apparent"). In addition to the divided case law cited in text, any claim that the alleged "unlawfulness" was "apparent" to LTG Sanchez here is fatally undermined even further by the fact that the Department of Justice's Office of Legal Counsel had issued a "binding and controlling . . . legal analysis" indicating that the complained of policies were lawful. Am. Compl. ¶ 62.

### A.    The Westfall Act Makes the United States, not LTG Sanchez, the Proper Defendant for Counts III, IV, and V

The Federal Employees Liability Reform and Tort Compensation Act of 1988, *codified at* 28 U.S.C. § 2679, commonly known as the Westfall Act,[25] makes a lawsuit "against the United States" under the Federal Tort Claims Act the "exclusive remedy" for injury "arising from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 2679(b)(1). As a consequence of the Act, government employees enjoy complete immunity: Any "civil action or proceeding for money damages" brought "against the employee" is "precluded." *Id.* The Act contains two specific exceptions, covering lawsuits "brought for a violation of the Constitution of the United States," § 2679(b)(2)(A), and lawsuits "brought for a violation of a statute of the United States under which such action against an individual is specifically authorized," § 2679(b)(2)(B).

The acts and omissions plaintiffs allege as the basis of their suit against LTG Sanchez all concern his performance as "Commander of the Coalition Joint Task Force - 7," exercising "command and control over all U.S. military personnel" serving in Iraq. Am. Compl. ¶ 28. Counts III, IV, and V of the Complaint, which allege violations of international law and

---

[25] That provision states in subsection (b):

    (1) The remedy against the United States provided by sections 134(b) and 2672 of this title for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government wile acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee. Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded without regard to when the act or omission occurred.

    (2) Paragraph (1) does not extend or apply to a civil action against an employee of the Government --

        (A) which is brought for a violation of the Constitution of the United States, or

        (B) Which is brought for a violation of a stature of the United States under which such action against an individual is otherwise authorized.

treaty, all concern actions within the scope of LTG Sanchez's federal employment and are covered under neither exception. As a result, those claims must be deemed claims "against the United States," General LTG Sanchez must be dismissed, and the United States must "be substituted as the party defendant." 28 U.S.C. § 2679(d)(1).

Over the past two years, courts in this District have applied the Westfall Act to dismiss international human rights claims in at least four cases brought against individual federal employees. See *Bancoult v. McNamara,* 370 F. Supp. 2d 1, 7-10 (D.D.C. 2004) (dismissing international law claims about forced removal of indigenous population from island for military base); *Gonzalez-Vera v. Kissinger,* No. 02-02240, slip op. at 10-21 (D.D.C. Sep. 17, 2004) (dismissing international law claims about removal of Chilean president); *Schneider,* 310 F. Supp. 2d at 264-68 (same); *Rasul,* 2006 WL 266570, at *4-*8 (dismissing Guantanamo detainees' international law claims of cruel and inhumane treatment).[26]    *See also, e.g., Elmaghraby v. Ashcroft,* 2005 WL 2375202, at *34-35 (E.D.N.Y. 2005). In each case, the court, deciding the question on the pleadings, concluded that the federal employee at issue was acting within the scope of his employment, and that claims for violations of international law did fit within the Westfall Act's specific and limited exceptions. In each case, the Court ordered the international law claims against the individual employee dismissed and ordered the United States substituted as the proper defendant. This Court should do the same here.

> 1.    The Westfall Act Applies to Counts III, IV and V, Because Plaintiffs Complain of Acts Within the Scope of LTG Sanchez's Employment

Just last week, the Attorney General certified that the acts and omissions plaintiffs complain of in this case were within the scope of LTG Sanchez's employment with the United States Army. *See* Exhibit A. That certification is entitled to "*prima facie* effect" and it,

---

[26]    Appeals in two of those cases are currently pending in the D.C. Circuit. *See Bancoult,* No. 05-5049 (Oral argument heard Feb. 16, 2006); *Gonzales-Vera,* No. 05-5017.

27

accordingly, shifts the burden to the plaintiffs to show that LTG Sanchez acted outside the scope

of employment. *Bancoult,* 370 F. Supp. 2d at 10 (citing *Kimbro v. Velten,* 30 F.3d 1501, 1509

(D.C. Cir. 1994)). To rebut the certification at this stage, the plaintiffs need to "have alleged

sufficient facts that, taken as true, would establish that the defendants' actions exceeded the

scope of their employment." *Stokes v. Cross,* 327 F.3d 1210, 1216 (D.C. Cir. 2003).[27] But in

this case that can never be done because plaintiffs' own allegations simply reconfirm what is

otherwise obvious — that in setting guidelines for the interrogation and detention of foreign

fighters in Iraq, LTG Sanchez was acting within his designated role as commander of U.S. forces

in Iraq.

Some of what plaintiffs complain about is the fact that LTG Sanchez carried out

the instructions and policies of Secretary Rumsfeld — the Nation's second-highest ranking

civilian military officer after the President. *See, e.g.,* Am. Compl. ¶¶ 71 & 75 (appointment of

Gen. Miller). But for a military officer to follow the orders of his civilian superiors cannot by

any stretch of the imagination be considered outside the scope of his employment. *Cf.*

*Schneider*, 310 F. Supp. 2d at 266 (finding Westfall Act immunity where, inter alia, the

employee had acted "at the express direction of the President"). To the contrary, by virtue of his

employment, LTG Sanchez was obligated to follow those orders.

Plaintiffs' Amended Complaint goes to great lengths to allege that the abuses at

Abu Ghraib and elsewhere were the product of deliberate U.S. policy. "The abuses at issue here

had their genesis in and were continually reinforced by policies, patterns or practices deliberately

formulated and adopted in the United States over long periods of time." Am. Compl. ¶ 10.

Having staked out that position, regardless of whether it is true or not for present purposes, the

---

[27] Because the Westfall Act issue can be decided on the basis of the pleadings, "there is no need for an evidentiary hearing." *Schneider,* 310 F. Supp. 2d at 265 n. 14.

plaintiffs can hardly turn around and argue that LTG Sanchez's conduct was somehow committed on a "frolic and detour" from his official duties so as to render him individually liable. When the plaintiffs complain of interrogation policies LTG Sanchez developed, *see, e.g.,* Am. Compl. ¶¶ 81-82, they cannot deny that those policies were developed entirely within the scope of LTG Sanchez's assigned duties and were designed wholly to serve the goal for which he was employed — winning the war. In no sense can LTG Sanchez be deemed to have acted outside the scope of his employment in taking the actions he is now being sued for. Indeed, outside the scope of his employment, LTG Sanchez had no reason or authority whatsoever to undertake any such acts.

The scope of employment question is normally settled by looking to the *respondeat superior* law of the state where the tortious act allegedly occurred to determine whether the employee's alleged act is one that an *employer* would be held responsible for under state law. *Tarpeh-Doe v. United States,* 28 F.3d 120, 123 (D.C. Cir. 1994). It would be inappropriate, however, to apply the law of the place of injury (Iraq) in this case, since in designing the FTCA, "Congress expressly intended to avoid the application of foreign law." *Kashin v. Kent,* 333 F. Supp. 2d 926, 929 (S.D. Cal. 2004) (citing *Sosa,* 124 S. Ct. at 2751-52). It is therefore necessary to choose some variant of U.S. law to decide the scope of employment issue. In doing so, we submit that the Court could follow the reasoning of the district court in *Rasul.* That court applied District of Columbia law rather than the law of Guantanamo Bay, reasoning that "Guantanamo does not provide adequate guidelines for determining scope of employment and the acts are 'inextricably bound up with the District of Columbia in its role as the nation's capital.'" *Rasul,* 2006 WL 266570, at * 5(citation omitted).[28]

---

[28] Alternatively, the Court could follow the reasoning of the district court in *Kashin v. Kent, supra.* That court, faced with a dispute over injuries caused by a civilian diplomat in Russia, solved the scope of employment issue by

The District of Columbia follows the general principles of *respondeat superior*

law as specified in the RESTATEMENT (SECOND) OF AGENCY (1958). See *Haddon v. United*

*States*, 68 F.3d 1420, 1423-24 (D.C. Cir. 1995); *Mosley v. Second New St. Paul Baptist Church*,

534 A.2d 346, 348 n.4 (D.C. 1987). Under the Restatement test:

> (1)    Conduct of a servant is within the scope of employment if,
> but only if:
>
> (a)    it is of the kind he is employed to perform; (b) it
> occurs substantially within the authorized time and space limits;
> (c) it is actuated, at least in part, by a purpose to serve the master,
> and (d) if force is intentionally used by the servant against another,
> the use of force is not unexpectable by the master.
>
> (2)    Conduct of a servant is not within the scope of employment
> if it is different in kind from that authorized, far beyond the
> authorized time or space limits, or too little actuated by a purpose
> to serve the master.

RESTATEMENT § 228 (quoted in *Mosley*, 534 A.2d at 348 n.4).

Each of the Restatement factors confirms the correctness of the Attorney

General's certification. First, it can hardly be doubted that LTG Sanchez's actions were "of the

kind he is employed to perform." § 228(1)(a). The very basis of the Complaint is that LTG

Sanchez "was the highest-ranking U.S. military official in Iraq, with command and control over

all U.S. military personnel serving there, including all individual military personnel with direct

contact with or responsibility for detainees in Iraq." Am. Compl. ¶ 28. As such, plaintiffs

cannot deny that LTG Sanchez's duties included responsibility for appointing and overseeing

---

looking to "general principles of tort law common to the majority of United States jurisdictions." See *Kashin*, 333
F. Supp. 2d at 930 (applying the RESTATEMENT (SECOND) OF AGENCY (1958)). Whether the Court applies general
principles of tort law as suggested in *Kashin* or the specific law of the District of Columbia as suggested in *Rasul*
will make no difference in this case, since the District follows the Restatement's guidelines. For that matter, a
similar test would control if this Court applied the *respondeat superior* law of Texas, the State from which this case
was transferred. See *Rodriguez v. Sarabyn*, 129 F.3d 760, 768 (5th Cir. 1997) ("[T]he Texas Supreme Court has
adopted the Restatement's general test for *respondeat superior*, and where there is no contrary case law, it is likely
to follow related provisions of the Restatements.").

those subordinates in charge of detentions and interrogations, and for developing and implementing interrogation policies. Indeed, if LTG Sanchez's employment did not encompass those responsibilities, then plaintiffs would have no basis for suit against him at all. The actions at issue all undeniably relate to "the prosecution of the business . . . entrusted" to LTG Sanchez by the United States. *Schechter v. Merchants Home Delivery, Inc.*, No. 04-CV-1071, 2006 WL 300433, at *10  (D.C. Feb. 9, 2006) (citation omitted).

Second, there can be no doubt that the acts at issue occurred "within the authorized time and space limits" of Sanchez's authority as the Commander of American forces in Iraq. §228(1)(b).

Third, plaintiffs do not allege and would have no basis for alleging that LTG Sanchez's actions were "activated" by anything other than his "purpose to serve the master." Restatement § 228(1)(c).  In this regard, it is irrelevant that plaintiffs believe LTG Sanchez's actions to have been unwise or unproductive. "It is the state of the servant's mind" that matters, Restatement § 235, cmt. a, not the ultimate wisdom of his actions. This is not a case where the employee committed an act "solely for his own benefit." *Schechter*, 2006 WL 300433 at * 13. Indeed, there is neither any allegation of, nor any basis for alleging, any selfish motivation at all. LTG Sanchez's orders for detention and interrogation were plainly motivated entirely by the purpose of ensuring the United States' objectives in Iraq.

Finally, when the master — that is, the United States, as represented by its authorized civilian officers — gave LTG Sanchez a command responsible for fighting enemy insurgents and for capturing and forcibly detaining enemy detainees, the "use of force" was far from "not unexpectable."  Restatement § 228(1)(d).  To the contrary, the use of force was expressly contemplated. *See also* Restatement § 245 cmt. c (explaining that an employee's use

31

of force may be within the scope of employment for respondent superior purposes even if the master expressly forbids the use of force, so long as the employment is one "which is likely to bring the servant into conflict with others").[29]

Plaintiffs' allegations that LTG Sanchez acted wrongfully, violated international law, or contravened certain statements of U.S. policy are irrelevant to this analysis. Immunity under the Westlaw Act explicitly extends to "wrongful act[s]." 28 U.S.C. § 2679(b)(1). Indeed, if the Westfall Act applied only to legal and non-wrongful conduct, "then immunity would be available only where it is not needed; in effect, the immunity doctrine would be 'completely abrogated.'" *Ramey v. Bowsher*, 915 F.2d 731, 734 (D.C. Cir. 1990) (per curiam).

The question under the Westfall Act is not whether the federal employee acted wrongly or rightly, but whether it would be fair under the circumstances to hold the *employer* liable for the employee's conduct. *See Schneider*, 310 F. Supp. 2d at 265 ("Defining an employee's scope of employment is not a judgment about whether alleged conduct is deleterious or actionable; rather, this procedure merely determines *who* may be held liable for that conduct: an employee or his boss.") (emphasis in original). And in answering that question, the District of Columbia, following the Restatement, takes quite a broad view. "Courts in the District of Columbia categorize practically *any* conduct as falling within the scope of, or incidental to, that authorized by [the] employer, so long as the action has *some* nexus to the action authorized." *Rasul*, 2006 WL 266570, at *6 (emphasis added).[30]    Given the broad sweep of plaintiffs'

---

[29] *See also* Restatement § 245, cmt. i (explaining basis for respondeat superior liability where agent is hired to engage in the kind of activity "which requires contacts with third persons under circumstances likely to lead to disputes"). Even if plaintiffs were right that LTG Sanchez permitted levels of force beyond those required by the circumstances, the law of respondeat superior does not consider a forceful act outside the scope of employment merely because an employee "in an excess of zeal uses more than necessary force." Restatement § 245, cmt. e.

[30] *See, e.g., Weinberg v. Johnson*, 518 A.2d 985 (D.C. 1986) (Laundromat employee's decision to shoot a customer who had left clothing in a laundry machine was within the scope of employment); *Howard University v. Best*, 484 A.2d 958, 987 (D.C. 1984) (university dean's physical and verbal sexual harassment of a professor was within the

32

allegations, if the United States were a private employer, it would surely be held answerable for the sorts of violations alleged to have occurred here. As a result, those acts must be deemed "within the scope" of LTG Sanchez's employment within the meaning of the Westlaw Act.

> ### 2.    The International Law Claims in Counts III through V Do Not Meet the Westfall Act's Specific, Limited Exceptions

Plaintiffs identify their third and fourth causes of action as addressing violations of the "law of nations," Am. Compl. ¶¶ 248, 253, and say their fifth cause of action is for violation of the Third and Fourth Geneva Conventions. Am. Compl. ¶ 257. These claims are subject to the Westfall Act because they do not qualify for either of the Act's two enumerated exceptions -- claims for alleged violations of international law and treaties clearly are neither claims for a violation of the constitution,[31] 28 U.S.C. § 2679(b)(2)(A), nor claims "for a violation of a statute of the United States under which such action against an individual is specifically authorized," § 2679(b)(2)(B).

The inapplicability of the first exception is self-evident, but the second requires some discussion. In order to qualify for the § 2679(b)(2)(B) exception, a plaintiff's claim must be (i) "*for a violation*," (ii) "of a *statute of the United States*" (iii) "under which such *action against an individual is specifically authorized*." § 2679(b)(2)(B) (emphasis added). The "law of nations" is, of course, not a statute at all -- it is not "a law passed by a legislative body." Black's Law Dictionary 1448 (8th ed. 2004). Nor are treaties like the Geneva Convention "statutes of the United States." Plaintiffs may try to solve this problem by looking to the ATS as the "statute" authorizing suit for Westfall act purposes. But the effort must fail, because — as the

---

scope of employment); *Lyon v. Carey*, 533 F.2d 649 (D.C. Cir. 1976) (delivery person's sexual assault of a customer following an argument over the delivery was within the scope of employment).

[31] The fact that plaintiffs' first and second causes of action assert claims under the Constitution does not remove LTG Sanchez's Westfall Act immunity from those counts not alleging constitutional violations. *Rasul*, 2006 WL 266570, at *9.

Supreme Court has recently explained — the ATS itself creates only *jurisdiction* to hear claims arising under international law. *Sosa*, 542 US at 712, 724 ("[T]he ATS is a jurisdictional stature creating no new causes of action. . . ."). International law claims brought under the ATS are not suits "for a violation of" the ATS, as would be required for the §2679(b)(2)(B) exception. Indeed, it is impossible to violate the ATS at all, since that statute sets no conditions, requirements, or prohibitions -- it does not regulate primary behavior at all. As a result, all four district courts to have considered the question after the Supreme Court's decision in *Sosa* have agreed that international law suits brought under § 1350 do not qualify for the Westfall Act exception. See *Bancoult*, 370 F. Supp. 2d at 9; *Gonzales-Vera* slip op. 15-16; *Rasul*, 2006 WL 266570, at *4-*8; *Elmaghraby*, 2005 WL 2375202, at*34.

Where the Westfall Act's limited exceptions do not apply, courts are not at liberty to avoid the Act's application. See *United States v. Smith*, 499 U.S. 160, 166 (1991) ("Congress' express creation of these two exceptions convinces us that the Ninth Circuit erred in inferring a third exception . . . .").

**B.    Plaintiffs Have Failed to State a Claim for Damages Against LTG Sanchez Under International Law and the ATS**

Even without the numerous jurisdictional shortcomings of plaintiffs' lawsuit, Counts III, IV, and V, which allege violations of international law, would have to be dismissed for failure to state a claim.

*1.    Counts III and IV Fail to State a Claim*

Although plaintiffs do not specify it with precision, they appear to have drafted Counts III and IV to pursue the remedy available for some violations of international law under the Alien Tort Statute (ATS), 28 U.S.C. § 1350, as interpreted in *Sosa v. Alvarez-Machain*, 542

34

U.S. 692 (2004). But the claim they make is not cognizable under *Sosa* — a case replete with cautions about the need for courts to tread lightly in addressing international law violations.[32]

First, plaintiffs seek to pursue a type of lawsuit that Congress has quite purposely rejected. As plaintiffs' own description of their case shows, the international rules they base Counts III and IV on are drawn, in large part, from the U.N. Convention Against Torture. But in ratifying the Convention Against Torture, the Senate expressly provided that the convention could not be considered self-executing, and did not by itself create private rights enforceable in U.S. Courts. 136 Cong. Rec. S 17486 (Oct. 27, 1990). And when Congress did act to effectuate the Convention in the Torture Victim's Protection Act (TVPA), 28 U.S.C. § 1350 note, it chose to provide a cause of action for damages only against individuals who commit torture while acting "under the actual or apparent authority, or color of law, of any *foreign* nation." § 1350 note (emphasis added). The TVPA, therefore, does not provide for damages against those acting under color of U.S. law. *See also* Statement by President Bush, 1992 U.S.C.C.A.N. 91, 92 (Mar. 16, 1992) ("I do not believe it is Congress' intent that H.R. 2092 should apply to United States Armed Forces or law enforcement operations, which are always carried out under the authority of United States law."). The decision to protect American military service members by limiting the TVPA damage remedy to those acting under color of foreign law cannot be reconciled with plaintiffs' attempt to hold U.S. actors like LTG Sanchez liable for alleged acts of torture under § 1350. *Sosa*'s requirement that courts engage in "vigilant doorkeeping" in applying the ATS

---

[32] *See Sosa,* 542 U.S. at 725 (Describing the *"restrained* conception of the discretion a federal court should exercise in considering a new cause of action of this kind"); *id.* (noting variety of factors that "argue for judicial *caution"* and "counsel[] *restraint"*); *id.* at 726 ("[T]he possible collateral consequences of making international rules privately actionable argue for judicial *caution*."); *id.* (noting a "high bar to new private causes of action," that "should make courts particularly *wary of impinging on the discretion of the Legislative and Executive* Branches in managing foreign affairs"); *id.* ("Since many attempts by federal courts to craft remedies for the violation of new norms of international law would raise risks of adverse foreign policy consequences, they should be undertaken, if at all, with *great caution*"); *id.* at 728 (noting the need for *"great caution* in adapting the law of nations to private rights") (emphases added).

must apply with special force when plaintiffs seek to shoehorn into the ATS a kind of lawsuit that Congress has explicitly rejected elsewhere. *Sosa,* 542 U.S. at 729.[33]

> 2.     *Count V Fails to State a Claim*

Count V, which alleges violations of the Third and Fourth Geneva Conventions, likewise fails to state a claim.   In *Johnson,* the Supreme Court held that the Third Geneva Convention did not confer upon private parties any capability to seek judicial redress for alleged violations in U.S. courts.   339 U.S. at 789 n. 14 ("Rights of alien enemies [under the Third Convention] are vindicated . . . only through protests and intervention of protecting powers" -- that is, States). The D.C. Circuit recently confirmed that *Eisentrager* continues to be good law in this regard. See *Hamdan v. Rumsfeld,* 415 F.3d 33, 39 (D.C. Cir. 2005).   And the D.C. Circuit simultaneously held that the same rule applies to the Fourth Geneva Convention:  Private parties have no basis for judicially contesting violations themselves; instead, responsibility for vindicating their rights rests on the signatory states.  *Id.* at 39-40.  Because neither the Third nor the Fourth Convention confers upon private parties any privately enforceable rights at all -- let alone rights to damages — Count V must be dismissed for failure to state a claim.

## IV.     There Is No Claim for Declaratory Relief Against LTG Sanchez

As we read the Amended Complaint, it does not seek declaratory relief against LTG Sanchez. *See* Am. Compl. ¶ 28 (LTG Sanchez is "sued in his individual capacity for damages"), and ¶ 262 (seeking a judicial declaration about "Defendant Rumsfeld's conduct"). Accordingly, we are not now responding in detail to plaintiffs' claim for such relief, but we

---

[33]  Moreover, *Sosa* also recognized a possible need for "case-specific deference to the political branches," and for giving "serious weight to the Executive Branch's view of the case's impact on foreign policy."  542 U.S. at 732 n.21.  For reasons detailed above, this case impermissibly intrudes upon the political branches, and could gravely harm the U.S.' efforts in foreign policy and warmaking — a fact that accordingly counsels against extension of the *Sosa* remedy to this context.

expressly reserve the right to do so in the future if plaintiffs seek to pursue such a claim against LTG Sanchez.[34]

## CONCLUSION

We recognize that under the liberal pleading standards of the federal rules, a Complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). If ever there was such a case, it is this one. The multiple precedents rejecting plaintiffs' theories, on virtually every relevant legal point, simply create an insuperable bar to plaintiffs' pursuit of their desired claims against LTG Sanchez.

Moreover, that insuperable bar exists for very good reasons. "[P]ermitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liabilities and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). When the discharge of those duties involves "the authority of the Executive in military and national security affairs," the courts are even more "reluctant to intrude." *Egan*, 484 U.S. at 529.

The critical backdrop for this case is an ongoing war. Surely our national interest would be better served by allowing LTG Sanchez to discharge his official duties, and to help defend us all, through fighting that war, unimpeded by the need to consult with counsel, to answer interrogatories, to appear for deposition or the threat of all those things and more.

---

[34] Unfortunately, the Amended Complaint is not clear in this regard. *See* Am. Compl. p. 83 (prayer for relief) (seeking declaration that "assigns responsibility for Plaintiffs' injuries to *Defendants*") (emphasis added). To the extent that plaintiffs do seek declaratory relief against LTG Sanchez, any such claim should be speedily dismissed. Declaratory relief is a discretionary remedy. *Sanchez-Espinoza*, 770 F.2d at 208 (citing *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491, 494 (1942)). Here, as in *Sanchez-Espinoza*, the plaintiffs seek this discretionary relief by using vague and general statutes like the ATS to attack foreign policy decisions made by the nation's highest leaders. As the D.C. Circuit has held, "[a]t least where the authority for our interjection into so sensitive a foreign affairs matter as this are statutes no more specifically addressed to such concerns than the [ATS]" a grant of declaratory relief would be an abuse of discretion. *Id.; see also id.* (equitable concerns in such a case "require the withholding of discretionary relief.").

Lawyers often liken litigation to war.  LTG Sanchez and his successors are in a real war, and we are not.  We urge the Court to allow him to return his full time and attention to the duties of fighting that war for our country, and to have to pay no further attention to this distracting "battle."

Respectfully submitted,


_/s/ Ryan E. Bull_
STEPHEN L. BRAGA
(D.C. Bar No. 366727)
RYAN E. BULL
(D.C. Bar No. 481743)
JOSHUA KLEIN
BAKER BOTTS LLP
1299 Pennsylvania Ave., NW
Washington, D.C. 20004
(202) 639-7700

March 6, 2006

*Counsel for Lieutenant General Ricardo S. Sanchez*